# EXHIBIT "A"

# AMERICAN ARBITRATION ASSOCIATION
## EMPLOYMENT ARBITRATION TRIBUNAL

IN THE MATTER OF THE ARBITRATION BETWEEN

IRENE ORSINO,

                      CLAIMANT,

AND

COUNTRYWIDE FINANCIAL CORPORATION AND
COUNTRYWIDE HOME LOANS, INC.,

                      RESPONDENTS.

AAA CASE NUMBER  13 160 00290 05

BEFORE:  JACQUELIN F. DRUCKER, ESQ.
                    ARBITRATOR

## OPINION AND FINAL AWARD

### I.     PROCEDURAL BACKGROUND

This matter was initiated by a Demand for Arbitration submitted to the American Arbitration Association ("AAA") by Irene Orsino ("Claimant") pursuant to a Mutual Agreement to Arbitrate Claims ("Arbitration Agreement") dated April 12, 2004, between Claimant and Countrywide Financial Corporation.[1]  By agreement of the parties, this matter proceeded in accordance with the AAA's *National Rules for the Resolution of Employment Disputes, Amended and Effective January 1, 2004* ("AAA Rules").  The undersigned Arbitrator was selected and appointed pursuant to those procedures.  Throughout these proceedings, Claimant was represented by James F. Kilcur, Esq. and David L. Hackett, Esq., of Saul Ewing, LLP, 1500 Market Street, 38th Floor, Centre Square West, Philadelphia, Pennsylvania. Respondents were represented throughout by Scott J. Wenner, Esq. and Jane H. Kauh, Esq., Schnader Harrison Segal & Lewis LLP, 140 Broadway, Suite 3100, New York, New York.

Matters related to liability were addressed in the Opinion and Partial Final Award issued on May 22, 2007.  That document is incorporated herein by reference, and the reasoning and findings set forth in it hereby become a part of this Final Award.  As stated in the Partial Final Award, the claims for age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§621-634, defamation, intentional infliction of emotional distress, unjust enrichment, *quatum meruit*, and breach of

---

[1] Both Countrywide Financial Corporation and Countrywide Home Loans, Inc. are named as Respondents in the Demand.  These two entities are referred to herein, collectively, as "Respondent," "the Company," or "Countrywide."

Irene Orsino, Claimant,
and
Countrywide Home Loans, Inc. and
Countrywide Financial Corporation, Respondents

AAA Case No. 13 160 00290 05

Opinion and Final Award

the covenant of good faith and fair dealing have been denied, as were the breach of contract claims related to incentive compensation under The Countrywide Financial Corporation, Consumer Markets Division Standard Branch Manager (BM) Incentive Compensation Plan, effective October 1, 2003. The claim regarding options that had vested pursuant to the 2000 Equity Incentive Plan of Countrywide Financial Corporation (Amended and Restated Effective June 14, 2004) ("Option Plan" or "Plan"), however, was granted, and Respondent was found to have breached the Option Plan by cancelling Claimant's 1,181 vested stock options. In the course of the hearing and again at the close of hearings, the parties agreed to hold the record open with regard to damages, and the Partial Final Award therefore provided that the record remained open "for the submission of evidence and arguments regarding the determination of damages relating to the claim." The Partial Final Award instructed the parties to confer in an effort to reach agreement regarding the measure of damages and, if such agreement were not possible, to confer with the Arbitrator to discuss subsequent steps. Pursuant to that provision, the parties, the Arbitrator, and the Case Manager held a conference call on June 13, 2007. The parties reported that they had reached agreement as to the valuation of the 1,181 options. Claimant, however, sought and was granted the opportunity to brief other issues related to the award of damages and attorney's fees. An agreed briefing schedule was developed. The parties' filings in this regard were timely submitted, whereupon the record in this matter was closed. In reaching the conclusions and findings set forth herein, the Arbitrator has given full and careful consideration to all evidence of record and all arguments and authorities advanced by the parties.

## II.    ANALYSIS

The options that were wrongfully cancelled had been awarded and vested pursuant to the 2000 Equity Incentive Plan of Countrywide Financial Corporation (Amended and Restated Effective June 14, 2004) ("Option Plan" or "Plan"). Under Paragraph 6.5(a) of the Option Plan, options are to be terminated if the holder's employment is terminated "for cause." Respondent contended that Claimant had been fired for fraud or willful misrepresentation, both of which are within the Plan's definition of "cause." The Arbitrator, however, found that neither criterion was established. Thus, as noted above, the Partial Final Award concluded that Respondent had breached its contractual obligations under the Plan by cancelling Claimant's 1,181 vested options. Claimant had attempted to exercise her 1,181 vested stock options on December 27, 2004, and the parties stipulate that, on that date, these options were valued at $31,980.53. Accordingly, this amount is awarded to Claimant.

In addition to this sum, Claimant seeks an award of pre-judgment interest and, relying on Delaware law, liquidated damages and attorney's fees and costs. She also asks to be awarded the right to recover post-judgment interest, should payment be delayed in the event judicial proceedings arise related to this award. Respondent does not object to the award of interest on the value of the options, nor have they challenged Claimant's calculation of interest at 8.25%, for a total of $7,040.30. Accordingly, that sum is awarded. A right to post-judgment interest, however, is not awarded, as entitlement to any such interest would be addressed in the forum in which subsequent judicial action, if any, were pursued.

The remaining issues requiring resolution are Claimant's Delaware-law theories of liquidated damages and attorney's fees and costs. Claimant contends that, in addition to the value of the vested options,

Irene Orsino, Claimant,
and
Countrywide Home Loans, Inc. and
Countrywide Financial Corporation, Respondents

AAA Case No. 13 160 00290 05

Opinion and Final Award

Sections 1103(b) and 1107 of the Delaware Wage Payment and Collection Act entitle her to a doubling of monetary damages and recovery of her reasonable attorney's fees and costs. DEL. CODE ANN. tit. 19 §§1103(b) and 1107 (2002). Claimant argues that these provisions of Delaware law apply by virtue of Section 18 of the Plan, which states as follows:

> This Plan and any agreements or other documents hereunder shall be interpreted and construed in accordance with the laws of the State of Delaware and applicable law. The Committee may provide that any dispute as to any Award shall be pr3sented [sic] and determined in such forum as the Committee may specify, including through binding arbitration. Any reference in this Plan or an Award Document to a provision of law or to a rule or regulation shall be deemed to include any successor law, rule or regulation of similar effect.

Respondent opposes Claimant's reliance on Delaware law, arguing that Claimant is attempting to amend her claim, long after any reasonable time for amendment has passed. Respondent notes that Claimant made no motion for leave to amend her claims in accordance with Rule 5 of the AAA Rules, nor did she reference application of Delaware law in her Demand for Arbitration or at any time during the process. Claimant's theory was asserted, for the first time, after the issuance of the Partial Final Award. As a result, argues Respondent, Claimant has waived any right that might exist to introduce a new theory of recovery based on Delaware statutes. Further, contends the Respondent, even if Delaware law appropriately were considered here, the cited statute cannot give rise to the relief sought. By its very terms, argues Respondent, the Delaware Wage Payment and Collection Act cannot be applied to this action.

In response, Claimant asserts that the Delaware theory of damages has been present in the case from the outset, as Paragraph 47 of the attachment to the Demand for Arbitration asserts that Respondent's refusal to pay Claimant "her wages, including the benefits, commissions and bonuses owed under the . . . stock option plan, is a violation of state law requiring the payment of wages." Further, she argues that the matters at issue do not relate to a new or different claim but, rather, pertain solely to the measure of damages for the claim that was granted in the Partial Final Award. Upon careful consideration of the parties' submissions on this point, the Arbitrator concludes that, for the reasons set forth below, the Delaware statutory wage provision does not apply in this instance.

Claimant did not cite Delaware law in the Demand or accompanying papers. Claimant did assert a generalized claim, quoted above, regarding "state law." The formal rules of pleading do not apply in arbitration, but at no time prior to the issuance of the Partial Final Award did Claimant make any reference to Delaware law. Instead, in her post-hearing briefing, Claimant unsuccessfully relied on Article 6 of the New York Labor Law Section 190(2), Section 191(3), and Section 193 in support of a claim for payment of "earned wages" and liquidated damages. The current assertion of Delaware law as a basis for the same type of recovery previously sought under the parallel New York statute places Claimant in an awkward analytical position. Nonetheless, for purposes of analysis, the Arbitrator gives full consideration to Claimant's effort to invoke Delaware statutory law.

Irene Orsino, Claimant,
and
Countrywide Home Loans, Inc. and
Countrywide Financial Corporation, Respondents

AAA Case No. 13 160 00290 05

Opinion and Final Award

Claimant starts with the holding, stated in the Partial Final Award, that Respondent breached the Option Plan when it cancelled Claimant's vested options. Damages for that breach, argues Claimant, should be measured pursuant to the Delaware Wage Payment and Collection Act because the Plan itself states, as noted above, that it "shall be interpreted and construed in accordance with the laws of the State of Delaware. . . ." Respondent challenges such broad use of that language, arguing that Section 18 is a narrow provision establishing governing law only for substantive contract issues. It is not, contends Respondent, a general choice-of-law clause through which all causes of action, including statutory claims for unpaid wages, may be brought under Delaware statutes.

The Arbitrator concludes that the limited language of Section 18 of the Option Plan does not indicate a choice by the parties to make all statutory protections and rights of Delaware law applicable to the variety of issues that might arise from, relate to, or emerge as a result of the Plan. Indeed, the terminology of Section 18 is specific and precise; it speaks of only interpretation and construction of the Plan, not incorporation of other rights or the creation of extra-contractual remedies. Section 18 thus is a contractual choice-of-law provision and, as such, it "does not bind the parties with respect to non-contractual causes of action." *Plymack v. Copley Pharmaceutical, Inc.*, 1995 U.S. Dist LEXIS 15104 (S.D.N.Y. October 11, 1995). For a choice-of-law provision to apply to non-contract matters, broader language, such as "disputes arising out of or relating to" would be required. *Id.* at *15-16. *See also Turtur v. Rothschild Registry International Inc.*, 26 F.3d 304, 309-310 (2d Cir. 1994). Limited terms such as those found in Section 18 cannot result in a sweeping incorporation of state law for various non-contractual matters that may arise under the Plan.

Although Claimant argues to the contrary, her effort to recover under the Delaware statute is based on a new and specific, non-contractual cause of action rather than a mere formula for measuring damages for breach of contract. The Delaware Wage Payment and Collection Act creates a system of obligations and remedies. Section 1102 imposes on employers a specific statutory obligation to pay, "on regular paydays," all wages due. Section 1103(a) requires that, in the event an employee is separated from employment, wages earned are to be paid on the next scheduled payday, as if employment had not been terminated. Section 1107 prohibits withholding of wages. In turn, the provisions upon which Claimant relies provide the remedies for breaches of these statutory requirements. The liquidated-damages provision, found in Section 1103(b), applies when an employer has failed to pay "as required under this chapter," and the attorney-fee provision, Section 1113, applies when an action for wages is brought "under this section" and a violation is shown. To reach this point under Delaware law, the analysis must step out of breach of contract, out of interpretation and construction, and into the specific statutory obligations and scheme imposed by the Delaware Wage Payment and Collection Act. The assessment of liquidated damages and attorney's fees is based upon a showing that the Act has been violated. These remedial provisions, therefore, relate to non-contractual rights and are not triggered by the parties' agreement to use Delaware law for construction and interpretation of the Option Plan.

Moreover, as Respondent has noted, the Delaware statute, by its own terms, cannot apply to these parties. The Delaware Wage Payment and Collection Act applies only to "employees," as defined in Section 1101(a)(3), to wit: "any person suffered or permitted to work by an employer under a contract of employment either made in Delaware or to be performed wholly or partly therein." Claimant had no

written contract of employment, and all arrangements for her services were made and fulfilled in New York. The Option Plan, which is not a contract of employment, was made in New York, not Delaware, and all of Claimant's services were rendered in the State of New York. Accordingly, the conclusion is ineluctable that the Delaware Wage Payment and Protection Act has no application in this action. It is triggered by neither Section 18 of the Option Plan nor the terms of the statute itself.

For these reasons, the claim for liquidated damages, attorney's fees, and costs must be denied. The measure of damages, as stated above, is the value of the 1,181 vested options plus pre-judgment interest.

## FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, have been designated pursuant to the parties' Mutual Agreement to Arbitrate Claims dated April 12, 2004, ("Arbitration Agreement") and in accordance with the American Arbitration Association's *National Rules for the Resolution of Employment Disputes Amended and Effective January 1, 2004.* Having been duly sworn, having heard the proofs, having given full and fair consideration to all of the evidence submitted and all factual and legal arguments presented, and having previously rendered a Partial Final Award dated May 22, 2007, I hereby issue the following **FINAL AWARD:**

1.  The claims for age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§621-634, defamation, intentional infliction of emotional distress, unjust enrichment, *quatum meruit*, and breach of the covenant of good faith and fair dealing are denied.

2.  The breach of contract claims related to incentive compensation under The Countrywide Financial Corporation, Consumer Markets Division Standard Branch Manager (BM) Incentive Compensation Plan, effective October 1, 2003, are denied.

3.  Respondents breached the terms of the 2000 Equity Incentive Plan of Countrywide Financial Corporation (Amended and Restated Effective June 14, 2004) by cancelling Claimant's 1,181 vested stock options. The claim for breach of contract in this regard therefore is granted. Based upon the parties' stipulation regarding the value of the options, Claimant is awarded the sum of Thirty-One Thousand Nine Hundred Eighty Dollars and Fifty-Three Cents ($31,980.53).

4.  Claimant also is awarded Seven Thousand Forty Dollars and Thirty Cents ($7,040.30) in prejudgment interest on this amount. Claimant's request for the award of a right to post-judgment interest is denied without prejudice.

Irene Orsino, Claimant,
and
Countrywide Home Loans, Inc. and
Countrywide Financial Corporation, Respondents

AAA Case No. 13 160 00290 05

Opinion and Final Award

5.  In accordance with Paragraph 7 of the parties' Arbitration Agreement, the
    administrative fees of the American Arbitration Association, totaling One
    Thousand Nine Hundred Fifty Dollars ($1,950.00), shall be borne as follows:
    Claimant shall pay One Hundred Twenty-Five Dollars ($125.00), and
    Respondents shall pay One Thousand Eight Hundred Twenty-Five Dollars
    ($1,825.00). Also in accordance with Paragraph 7 of the parties' Arbitration
    Agreement, the compensation of the Arbitrator, totaling Twenty-Nine Thousand
    Four Hundred and Forty Dollars ($29,440.00), shall be borne by Respondents.

6.  This Award is in full settlement of all claims submitted to this arbitration. All
    claims not expressly granted herein are denied.

Dated: _18 August 2007_

Jacquelin F. Drucker, Esq.
Arbitrator

**AFFIRMATION**

STATE OF NEW YORK

SS:

COUNTY OF NEW YORK

I, Jacquelin F. Drucker, an attorney admitted to practice in the State of New York, affirm pursuant to
CPLR Section 2106 and under penalty of perjury that I am the Arbitrator in the foregoing matter and that
this document, which I have executed on this date, is my Final Award in this matter, issued in compliance
with my oath and with all applicable laws, rules, and agreements.

Dated: _18 August 2007_

Jacquelin F. Drucker, Esq.
Arbitrator

*Page 6 of 6*

# AMERICAN ARBITRATION ASSOCIATION
## EMPLOYMENT ARBITRATION TRIBUNAL

IN THE MATTER OF THE ARBITRATION BETWEEN

IRENE ORSINO,

AAA CASE NUMBER  13 160 00290 05

CLAIMANT,

AND

BEFORE:  JACQUELIN F. DRUCKER, ESQ.
ARBITRATOR

COUNTRYWIDE FINANCIAL CORPORATION AND
COUNTRYWIDE HOME LOANS, INC.,

RESPONDENTS.

## OPINION AND PARTIAL FINAL AWARD

### I.    PROCEDURAL BACKGROUND

This matter was initiated by a Demand for Arbitration submitted to the American Arbitration Association ("AAA") by Irene Orsino ("Claimant" or "Ms. Orsino") pursuant to a Mutual Agreement to Arbitrate Claims ("Arbitration Agreement") dated April 12, 2004, between Claimant and Countrywide Financial Corporation.[1]  By agreement of the parties, this matter proceeded in accordance with the AAA's *National Rules for the Resolution of Employment Disputes, Amended and Effective January 1, 2004* ("AAA Rules").  The undersigned Arbitrator was selected and appointed pursuant to those procedures.  Throughout these proceedings, Claimant was represented by James F. Kilcur, Esq. and David L. Hackett, Esq., of Saul Ewing, LLP, 1500 Market Street, 38th Floor, Centre Square West, Philadelphia, Pennsylvania.  Respondents were represented throughout by Scott J. Wenner, Esq. and Jane H. Kauh, Esq., Schnader Harrison Segal & Lewis LLP, 140 Broadway, Suite 3100, New York, New York.

Pre-hearing processes and discovery proceeded in a productive manner, although several extensions of the hearing dates were arranged to accommodate scheduling and discovery needs of the parties.  The matter was heard, by agreement of the parties, on January 8, 9, 10, and 11, 2007, at the New York City offices of Schnader Harrison Segal & Lewis LLP.  In the course of the hearing, more than 100 documents were admitted into evidence.  All testimony was presented under oath, and witnesses were sequestered.  By agreement of the parties, a transcript was taken by a certified court reporter and provided to the Arbitrator

---

[1] Both Countrywide Financial Corporation and Countrywide Home Loans, Inc. are named as Respondents in the Demand.  These two entities are referred to herein, collectively, as "Respondent," "the Company," or "Countrywide."

Irene Orsaru, Claimant,
and
Countrywide Home Loans, inc. and
Countrywide Financial Corporation, Respondents

AAA Case No. 13 160 00298 06

Opinion and Partial Final Award

following the conclusion of the hearing. Through the thorough preparation and coordination by counsel and the efforts of a diligent court reporter, the hearing was completed in four days of extended hours. Counsel are commended for their efforts in conducting the hearing in an efficient and professional manner.

The parties agreed that post-hearing briefs would be submitted in accordance with a schedule agreed upon by counsel after the receipt of transcripts. Further, the parties agreed that the record would be held open for the possible submission of evidence and arguments regarding the valuation of stock options and the calculation of attorney fees and costs, should the Arbitrator find an entitlement to same. Following receipt of the transcript, the parties developed an agreed schedule for post-hearing briefs and replies. All submissions were timely conveyed to AAA in accordance with that schedule and were forwarded to the Arbitrator. In finding the facts and reaching the conclusions and Partial Final Award set forth herein, the Arbitrator has given full and careful consideration to all evidence of record and all arguments advanced by the parties at hearing and in their pre- and post-hearing submissions.

## II.    FACTS[2]

Claimant began her career in real estate mortgaging in Staten Island in 1977 and in 1990 became the Branch Manager of a small bank. In early 1999, she was recruited by Countrywide to serve as Branch Manager of its new Staten Island branch (also known as Branch 629). Eric Declereq, Regional Vice President, had been impressed with Claimant's foundation and reputation in the closely knit banking and real estate community of Staten Island, and he persuaded her to join the Company. In the years that followed, Claimant and Mr. Declereq, her immediate supervisor for most of that time, developed mutual respect, reciprocal business loyalty, and a productive working relationship.

The Branch's functions are divided into two broad categories: Sales and Operations. As Branch Manager, Claimant was responsible for both, and the Countrywide approach to full-service branches gave her levels of responsibility and independence that compare to those of a CEO. The Sales side of the business brings in loan customers and gathers and assesses basic qualifying information, matching the customer with the proper type of loan. The Operations component of the Branch evaluates and verifies the information presented and ensures that the loans are processed and documented properly. The latter function is of critical importance, as the loans are sold on the secondary market and the Company must ensure that its representations of risk are accurate.

Claimant steadily built the Sales team of loan officers and originators and met with success in the generation of business. In Operations, however, the Branch continually faltered. The staff included processors and underwriters who were overseen by an Operations Manager. Throughout her tenure, however, Claimant encountered difficulty securing the services of a capable Operations Manager. While Claimant had full authority to hire sales personnel, the hiring of an Operations Manager involved higher

---

[2] Set forth below is a summary version of background and context of the disputes at issue. The record is far more detailed and was fully considered in rendering the instant Partial Final Award. In addition, some findings that have specific relevance to an issue of law are set forth within the Analysis.

Irene Orsino, Claimant,
and
Countrywide Home Loans Inc. and
Countrywide Financial Corporation, Respondents

AAA Case No. 13-160-DO20505

Opinion and Partial Final Award

level input. In three years, the Branch had three different Operations Managers, and Claimant expressed dissatisfaction with all. In 2003, an Operations Manager about whom Claimant had reservations was hired. Claimant attributes much of the Branch's operational failings to the lack of a competent Operations Manager.

In 2001, Claimant's daughter, Lauren Orsino, was hired as a loan officer[5] at the Branch. The Company did not have an anti-nepotism policy, and Claimant cleared the hiring with Mr. Declercq, who, in view of the familial relationship, discussed the hiring with the Divisional Vice President. Mr. Declercq testified that, although he was not comfortable with the arrangement, he left the decision in Claimant's hands, asking her to take the steps necessary to make the situation work.

In early 2003, Mr. Declercq was contacted by a loan processor from the Branch who expressed discomfort with certain practices and asserted that Lauren Orsino and one of the loan processors were working closely together, which may impair the separation between Sales and Operations that protects the integrity and reliability of the process. The Fraud Prevention and Investigation Unit conducted an audit and found that the processor had been involved in misrepresentation of customers' employment status. In May 2003, Claimant was instructed to work with Human Resources to terminate his employment. Nothing implicated Lauren Orsino in the misdeeds. The results of the audit, however, sparked broader concerns. Erin Allen, Senior Divisional Vice President, Division Operations Manager, wrote as follows:

> Further concerns were discovered during the course of this investigation with regard to processing procedures and quality in BR 629. It became apparent that there are serious issues in the branch with management of underwriting, processing, and closing functions. Our plan is to deliver written counseling to Irene Orsino, Branch Manager. This written counseling will be delivered by Eric Declercq, RVP, within the next week. An interim Operations Manager, Marcie Reilly, is now working in BR 629 until a permanent operations manager can be identified. Marcie will assume operational oversight and underwriting authority for the branch until further notice.

(R. 30.) Mr. Declercq, however, did not issue a written counseling to Claimant, although he confirmed that concerns were expressed to Claimant regarding the need to more effectively manage the Operations functions. Claimant testified that she was unaware of the concerns noted in the foregoing message and at hearing she stressed that it was Operations personnel within the Branch, not Sales staff, who should have been checking and catching these problems. She denied that she was cautioned or that concerns were expressed to her, but Respondent's witnesses testified credibly that, shortly after the termination of the processor, a conference call was held during which time Claimant was sternly cautioned by James Comosa, Executive Vice President, Northeast Division Manager that she needed to control the operations and processing functions within the Branch and that she needed to exercise great care in dealing with the

---

[5] The official job titles used by Respondent are more elaborate and specific. The terms loan officer or originator are used in a more generic sense, to indicate employees in the Sales functions, and processor or underwriter to indicate employees working in Operations.

Irene Orsino, Claimant,
and
Countrywide Home Loans, Inc. and
Countrywide Financial Corporation, Respondents

AAA Case No. 13-166-00290-05

Opinion and Partial Final Award

presence of her daughter on the sales team.  In addition, the Regional Operations Manager conducted training for the Branch Operations staff and implemented a new employment-verification policy designed to help prevent the fraud in employment information.

A year later, targeted audits revealed serious shortcomings in the accuracy and reliability of loan processing.  Due to a high delinquency rate for loans at the Branch, Respondent's Quality Control operation conducted an initial audit in July 2004, examining eight closed loans, selected because of delinquency status.  Of the eight loans, six were rated Severely Unsatisfactory and one was rated High Risk.  The loan officer for all eight loans was Lauren Orsino, and all eight were "stated-document loans," also known as "Fast and Easy" loans in which reduced documentation of qualifying factors is required of the customer.  Among the failings in the processing of these loans were missing documents, lack of reasonable relationship between income and employment, unacceptable debt-to-income ratio, unqualified property, and straw buyers.  In addition, the review revealed instances in which the loan officer entered the borrower's income into the computer program that determined eligibility, and then, if rejected, entered higher income levels until the computer program generated an acceptance.  This suggested that the loan officer was overstating the borrower's actual income.  (The computer system used for this function was being phased out and replaced with a system to which sales personnel would not have access.  The Staten Island Branch, however, was slow in adopting this system and was among the last branches to put it in place.)  The audits also identified Claimant as the underwriter for each, but substantial dispute exists as to whether Claimant actually performed that function.  Quality Control recommended that the Branch be targeted for further review.

Upon learning of the audit results, Ms. Allen studied the findings and, because some of the loans examined had been fairly old, she asked that Quality Control examine additional loans from the Branch.  As a result, in September 2004, another audit was conducted, which Quality Control noted was due to the indication in the July audit of "misuse of stated doc loans."  Of these loans, one was rated Severely Unsatisfactory, three were rated as having "Document Deficiency," and one was acceptable.  Lauren Orsino was not the loan officer for these five, but, again, the audit revealed adjustments of income entries, suggesting overstatement of income, and possible borrower fraud with regard to employment verification.  Quality Control recommended that "further action taken by Management for continued misuse of stated doc and reduced doc program in this Branch."

In October 2004, Quality Control audited another five loans, and four were rated Severely Unsatisfactory.  Again, all were stated-document, Fast and Easy loans.  Quality Control's findings and recommendation stated as follows:

> QC has audited 20 loans from Branch 629 since 07/04.  Of those 20, 9 (45%) were rated severely unsatisfactory and 2 were rated high risk with a majority of the ratings due to overstated income to receive [acceptance of the loan through the computerized program] or fraud for income or employment.  The review identified several issues regarding

inconsistencies in documentation and program violations. QC recommends further action taken by Management for continued misuse of stated doc and reduced doc program at this Branch.

(R. 34).[3]

Based on the foregoing findings, Ms. Allen more closely examined the loans at issue, and she and the new Regional Operations Manager visited the Branch to conduct interviews. Ms. Allen summarized the information in a memorandum that she circulated to Divisional and Regional management. A conference call was conducted in which Ms. Allen, Mr. Declercq, and Mr. Comosa, as well as the new Regional Operations Manager, the Executive Vice President of National Operations, the Area Sales Manager and others participated. All agreed that Lauren Orsino and one processor should be removed from employment. All concluded that Claimant should be terminated, but Mr. Declercq initially thought that a final warning would be appropriate. He testified, however, that it was his fondness for Claimant that caused his hesitation and that, ultimately, he agreed that responsibility for lack of control over the processing functions, which had given rise to what he called a "raging inferno" had to rest with Claimant and that, given the audit findings, considerations of dedication, loyalty, and sales production were not relevant.

It was decided that Claimant would be placed on administrative leave with pay until Human Resources could be consulted and could complete the investigation. Upon reviewing the records, however, the Executive Vice President, Employee Relations and the Executive Vice President of Consumer Marketing, Human Resources advised Ms. Allen that no further investigation was necessary and that Claimant's employment should be immediately terminated. Accordingly, Claimant was notified in person on October 24, 2004, that her employment was terminated.

## III.   CLAIMS ASSERTED

Claimant has asserted six causes of action relating to or stemming from the termination of her employment, to wit: (1) defamation; (2) intentional infliction of emotional distress; (3) age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§621-634 ("ADEA"); (4) breach of contract; (5) unjust enrichment/*quantum meruit*; and (6) breach of the implied covenant of good faith and fair dealing. (As Respondent notes, the breach of the covenant of good faith and fair dealing was not stated in the claim and was raised for the first time in Claimant's post-hearing brief. For purposes of analysis, the Arbitrator regards that claim as having been properly added.) Claimant initially raised a claim of tortuous interference and two claims alleging violation of the Employee Retirement Income Security Act, 29 U.S.C. §§1001-1461 ("ERISA"), but those claims were withdrawn prior to hearing. (Tr. 5.)

---

[3] References to the record are identified as follows: "Tr." for Transcript, "R." for Respondents' Exhibits, and "C." for Claimant's Exhibits. In the interest of brevity, specific transcript and exhibit citations are used sparingly.

Irene Orsino  Claimant,
and
Countrywide Home Loans, Inc. and
Countrywide Financial Corporation  Respondents

A.A.A Case No. 13 160 00290 05

Opinion and Partial Final Award

## IV.    ANALYSIS

### A.  Claims Related to Termination

#### 1.  Introduction

As Respondent notes, Claimant was employed at will and had no contractual right to continued employment. Respondent therefore could terminate her employment at any time, for no reason or even for an erroneous reason, as long as the action was not the product of discriminatory motivation. Claimant does not dispute this but asserts that her employment was terminated because of her age, in violation of the ADEA, and that actions associated with the termination were defamatory and constituted intentional infliction of emotional distress.  Upon careful consideration of these claims, the Arbitrator concludes that each must be denied, as addressed below.

#### 2.  Discrimination on the Basis of Age

Claimant asserts that the termination of employment was the product of discrimination on the basis of her age.  The facts of record, however, do not support this claim.  Claimant has the burden of establishing *prima facie* evidence of age discrimination.  While that burden is not onerous, it has not been met. Claimant, at age 61, was within the protected age class when the adverse action of termination was taken, and these factors satisfy two of the four threshold elements.  The other two elements of the prima facie case are lacking, however, as the record does not indicate that Claimant was performing satisfactorily, nor is there evidence that would give rise to the inference of discrimination, such as replacement by a substantially younger person. *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69 (2d Cir. 2005); *McDonald v. Maimonides Medical Center*, 2002 U.S. Dist. LEXIS 2704 (E.D. N.Y. 2002).

Although Claimant was successful at generating sales, she also carried ultimate responsibility within the Branch for Operations, and there were clearly inadequacies in the Branch in this regard.  Both aspects of a Branch must function properly for business to be success, for high sales productivity is meaningless if the loans are not properly processed and documented, making them less valuable (or without value) in the secondary loan market.  Claimant's Branch in August 2004 performed poorly in comparison to other branches in the region with regard to the number of loan deficiencies and compliance problems, and the Branch had mediocre performance with timely filing of loans.  These indicators grew worse in September 2004.  When these shortcomings are combined with the fraudulent action of the underwriter in 2003 and the serious processing and verification failings found in the three 2004 Quality Control audits, after which upper management had "pleaded" with Claimant to take control of Operations, it simply cannot be said that the Claimant, as Branch Manager with full responsibility for all operations within the Branch, was performing satisfactorily.

Irene Orsino, Claimant,
and
Countrywide Home Loans, Inc. and
Countrywide Financial Corporation, Respondents

AAA Case No. 13 160 00298 05

Opinion and Partial Final Award

Claimant asserts that she cannot be held responsible for the problems in Operations because she repeatedly sought to have matters rectified through the hiring of a capable Operations Manager and, later the replacement of a poor performing Operations Manager. Claimant also highlights some inaccuracies that existed within the Quality Control audits. Indeed, the finding that Claimant served as underwriter to loans her daughter generated is subject to question and a few findings may be readily explained and excused, but many of the failings found in the audits were valid and beyond excuse or explanation, including the strong indication that borrowers' incomes were overstated and the Fast and Easy process was manipulated by several loan officers, including Lauren Orsino. Claimant also argues the Branch Manager and, while she may have had no direct involvement in or knowledge of the operational shortcomings, the audits showed systemic problems indicative of broad-based improper loan handling and processing that either was tolerated or was allowed to flourish due to lack of controls, made more problematic by the link of Claimant's daughter to what Quality Control called "misuse" of stated-document loans. Thus, even disregarding the questionable listing of Claimant as the underwriter of her daughter's loans, serious systemic problems nonetheless were present within the Branch over which Claimant had full responsibility and which lead inexorably to the conclusion that her performance was not satisfactory.

Even assuming, for purposes of argument, that Claimant should not be held responsible for the problems within Operations and that she should be regarded as having performed satisfactorily, the *prima facie* case still fails, for there has been no proof offered that would give rise to an inference of discrimination. There has been no showing that similarly situated employees were treated differently, for the record shows that no other Branch has encountered such operational difficulties. (One Branch Manager was terminated for fraud and Claimant argues that this person was placed on administrative leave first, but the record indicates that this was because Human Resources had not yet concluded its investigation of the matter that ultimately led to her termination.)

Of even greater significance, Claimant was replaced by a person who was a mere two years younger, which precludes the conventional prima facie inference based upon replacement by a substantially younger person. Claimant asserts that this new hire was merely a placeholder and that true replacement was intended eventually to be a substantially younger man who had expressed a desire to become Branch Manager. Claimant bases this theory on the assertion that, one year prior to joining Respondent, her replacement had stated that she hoped to retire and leave New York in a few years. Claimant also notes that the younger male employee who sought the job sent an email to the Regional Operations Manager thanking her for her support and saying that he was disappointed at not achieving his goal "for now." These facts, taken together, argues Claimant, establish that the replacement was hired only as an intervening effort to insulate the Company against allegations of age discrimination and that the true intention was to eliminate Claimant to make way for the younger male employee. The analysis requires an analytical leap that the Arbitrator cannot make. The replacement remains on the job as Branch Manager two and one-half years after she was hired, and the e-mail message sent by the applicant for that position reflects only his own aspirations and ambition and cannot be used to project intention to or commitment by the Company. Indeed, this person, to whom Claimant alleges the Branch Manager position was promised for the future, contacted Claimant at her new job, inquiring about opportunities with that company.

Irene Orsino, Claimant,
and
Countrywide Home Loans, Inc. and
Countrywide Financial Corporation, Respondents

AAA Case No. 13 160 00290 05

Opinion and Partial Final Award

Finally, the Arbitrator notes that, even if a *prima facie* case of age discrimination were met, which is not the case, the Respondent has demonstrated, through the same facts that demonstrate a lack of satisfactory performance, that it had a legitimate non-discriminatory business purpose in terminating Claimant's employment, and nothing has been adduced to suggest that these reasons formed a pretext for discriminatory motives. *Roge v. NYT Holdings, Inc.*, 257 F.3d 164 (2d Cir. 2001). For all of these reasons, the claim of age discrimination must be denied.[5]

### 3. Defamation and Intentional Infliction of Emotional Distress

#### a.    In General

With regard to the claims of intentional infliction of emotional distress and defamation, Claimant emphasizes the manner in which Claimant's termination on October 25, 2004, was handled. Claimant argues that, by terminating her on premises at 2:00 p.m., without advance notice, and having her escorted out by a Company representative with whom others in the office were not familiar, Respondent set up the situation to attract attention and to create the appearance that Claimant was being arrested. The Arbitrator has carefully reviewed the record with regard to the actual events of that day, the way in which they were carried out, and the rationale advanced by the decision-makers for why each particular step was taken, and nothing supports a finding of any nefarious motivation or ill will toward Claimant or any communication of defamatory information.

#### b.    Intentional Infliction of Emotional Distress

Claimant argues that her treatment with regard to the termination was malicious and, under the standard enunciated in *Howell v. New York Post Company*, 596 N.Y.S. 2d 350, 353, 612 N.E. 2d 699, 702 (1993), was "so outrageous in character, and so extensive in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Respondent notes the skepticism and reticence that the courts, including the *Howell* court, have demonstrated when dealing with intentional infliction of emotional distress claims that emanate from the employment context. Those limitations and restrictions need not be addressed, however, for, even using the conventional standard applicable in any setting, the actions of Respondent have not been shown to meet the standard for this claim.

Claimant argues that Ms. Allen knowingly fabricated the basis for the termination when she characterized Claimant as the underwriter of loans written by her daughter, represented herself as Claimant's supervisor, stated that Claimant had been warned about such actions, noted that Claimant's daughter was perceived as having a relationship with the underwriter, and "mischaracterized" an interview with one of the other operations employees. The foregoing assertions, however, are based in large part upon

---

[5] Respondent argues that the age-discrimination claim was baseless and void *ab initio* and, therefore, attorney fees and costs should be awarded to Respondent. This request, however, is in the nature of a counterclaim and was not raised in accordance with AAA Rule 5. In any event, the Arbitrator finds that the standard articulated in *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978), for recovery of attorney fees has not been met.

Irene Orsino, Claimant,
and
Countrywide Home Loans, Inc. and
Countrywide Financial Corporation, Respondents.

AAA Case No. 13 160 00590 05

Opinion and Partial Final Award

contentions of fact that have not been adopted by the Arbitrator. As noted above, the Arbitrator has credited the Respondent's witnesses who attested to having cautioned Claimant regarding operational problems in her branch. While no formal counseling or warning was issued, the concerns and need for correction were emphatically conveyed. Further, Claimant overstates the role that a few questionable assertions of audit data played in the group's decision that termination was appropriate. The decision ultimately turned on the overall state of operations within the Branch, not on any of the lesser specific points with which Claimant takes issue. Claimant also contends that Mr. Comosa, the Executive Vice President, Northeast Division Manager, exhibited careless disregard for the truth when he acknowledged at hearing that he did not care if the Quality Control audit information was inaccurate as to Claimant's involvement as underwriter. The point that was established when that testimony is taken in context, however, is the reality that the Branch Manager is held responsible, and legitimately so, for misdeeds and incompetencies of those who report to her. While she may have had no direct involvement, a manager with such broad responsibility should have exercised sufficient managerial control to protect the Company from these failings.

### e.     Defamation

The facts of record do not support a finding that Respondent defamed Claimant. The claim requires, as an initial matter, a defamatory statement of fact regarding the Claimant. The record is lacking in evidence of any such statement or assertion. The most that may be cited is Claimant's argument that the new Regional Operations Manager may have told Branch employees that Claimant was no longer with the Company because of "recent audits and an investigation." The Arbitrator finds that the record does not lead to the conclusion that this is what was said but, even if it did, there had been an investigation, which makes the statement true and therefore non-defamatory. Claimant argues that the term "investigation" carries the connotation of criminal investigation, but nothing said by any representative of Respondent indicates any such allusion to criminal activity and, even when viewed against the backdrop of circumstances as Claimant argues that the law requires, the term would not cause the reasonable listener to conclude that a reference was being made to criminal action. It is unfortunate that rumors circulated, but the law of defamation applies to statements made, not to stories conjured up or embellished by unidentified third parties, nor to a failure to curtail rumors sparked and circulated by others. Claimant's reliance on *Weldy v. Piedmont Airlines*, 1995 US Dist. Lexis 7958 (W.D. N.Y. 1995), is misplaced. The defamatory action addressed in that decision reducing a jury's verdict was a specific utterance that the plaintiff had committed a physical assault, not the fact that he had been escorted from the workplace. In fact, the court appears to have considered the latter point as one of the impermissible factors that led the jury to an excessive verdict based on emotion rather than facts and law.

Irene Osmo, Claimant,
and
Countrywide Home Loans, Inc. and
Countrywide Financial Corporation, Respondents

AAA Case No. 13 1461292046 5

Opinion and Partial Final Award

---

### B.   Compensation-Related Claims

#### 1.   Monthly and Quarterly Incentive Compensation

##### a.      The Applicable Terms

Claimant received a base salary with the potential for additional incentive compensation based upon the Branch's performance. The Countrywide Financial Corporation, Consumer Markets Division Standard Branch Manager (BM) Incentive Compensation Plan ("the Compensation Plan"), effective October 1, 2003, establishes two primary forms of incentive compensation: Monthly Internal Production Incentive, derived through a formula and the use of "monthly incentive adjustments," and the Quarterly Profit Incentive, adjusted through the use of modifiers.  The Plan states that the monthly incentive "is paid at the end of the month following the incentive period" and the quarterly payment "is paid 45 days following the production period."

Claimant asserts that she is entitled to monthly commission payments for September and October 2004 in the sum of $15,000 and that she also is entitled to quarterly compensation for the Third Quarter of 2004 (July, August, and September 2004) in the sum of $177,803.49.  Claimant argues that she is entitled to these sums under the specific terms of the Plan and also under theories of *quantum meruit*, unjust enrichment, the implied covenant of good faith and fair dealing, and New York Labor Law.  Respondent argues, however, that Claimant was not eligible for these incentive payments because she was no longer employed after October 24, 2004.

Claimant asserts that the Plan provides only that sums are to be "paid" and that nothing in the Plan conditions payment upon continued employment.  Respondent, however, relies upon the Countrywide Financial Corporation Incentive Plan Terms and Conditions Effective May 1, 2004 ("Terms and Conditions"), which state in Paragraph 3(a)(i) that, to be eligible for an incentive, an eligible employee "must be employed in active status from the first business day of the incentive Period through the last day of the following month . . . ."  This, argues Respondent, is consistent with the purpose of the Plan, which is not only to attract and compensate employees but also is designed as a retention plan to ensure that valued employees have motivation to remain employed.  As stated in Paragraph 1 of the Terms and Conditions, the purpose of the Plan "is to attract and retain individuals as employees of Countrywide Financial Corporation and to provide incentive compensation that is based on their performance and contributions to the Company."  Thus, argues the Respondent, eligibility for a person no longer employed on the payment date is precluded by both the letter and the intent of the Plan and the Terms and Conditions.  Further, notes Respondent, the Terms and Conditions specifically address employees whose employment is involuntarily terminated.  Paragraph 6 (c) provides, "An Eligible Employee . . whose employment is involuntarily terminated . . ., at any time, prior to the date on which a Monthly, Quarterly, Semiannual or Annual Incentive is paid, will not be eligible to receive an Incentive unless otherwise stated in the Incentive Plan or as required by applicable state law."

Irene Dvoirce, Claimant,
and
Countrywide Home Loans, Inc. and
Countrywide Financial Corporation, Respondents

AAA Case No. 13-1610079444-S

Opinion and Partial Final Award

The referenced document was admitted into evidence without objection, but it was only alluded to in testimony. In her brief, Claimant asserts that she did not receive and never saw the Terms and Conditions, but Claimant did not address this matter in testimony. By the same token, no proof of receipt by Claimant or of general circulation to employees was addressed at hearing. Nonetheless, the Incentive Plan Acknowledgment, which is set forth on page four of the Plan, specifies that the employee's use of electronic signature, which Claimant did on October 3, 2003, demonstrates the employee's acceptance of the terms and conditions of the Plan "and any applicable amendment including the Countrywide Financial Corporation Incentive Plan Terms and Conditions . . . which are incorporated into and made a part of this Incentive Compensation Plan and may be revised from time to time." (R.13, R.18.)

In view of the foregoing language, the Arbitrator must regard the Terms and Conditions, which were effective May 1, 2003, as having been incorporated into the Plan, which was effective October 1, 2003. Accordingly, under the provisions of Paragraph 3(a)(i) and Paragraph 6(c) of the Terms and Conditions, Claimant was not eligible for either the monthly or the quarterly payments, as her employment ended on October 24, 2004.

**b.    Covenant of Good Faith; *Quantum Meruit***

Claimant alleges that Respondent intentionally timed her termination and declined to use administrative leave so as to deprive Claimant of these payments. Had the termination been delayed just a few days or if Claimant had been on administrative leave for a relatively brief period, she would have been eligible. This action, alleges Claimant, breaches the covenant of good faith and fair dealing. The record, however, shows not an inkling of any possible effort by Respondent to effectuate the termination before Claimant would become eligible. The decision to move directly to termination rather than placing Claimant on administrative leave was made by Human Resources personnel who were not involved with benefit issues. Moreover, the timing followed a logical, normal progression from the three audits, to further investigation, meeting, and action. Nothing was rushed or manipulated and there was no indication that any of the participants in the decision, which was made with upper level management involved, were considering ways to keep Claimant from receiving incentive compensation. Accordingly, there is no basis in the record for use of the covenant of good faith and fair dealing as a basis for disregarding the limitations imposed by the Plan and the Terms and Conditions.

Similarly, the applicability of the contract renders inapplicable the theories of unjust enrichment and *quantum meruit*. *Clark-Fitzpatrick, Inc. v. Long Island Railroad Co.*, 70 N.Y.2d 382, 516 N.E.2d 190, 521 N.Y.S.2d 653 (1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.")

**c.    New York Labor Law**

Claimant has cited New York Labor Law §§190(2), 191 (3), and 193 as a basis for payment of earned wages and liquidated damages, but, as an initial matter, applicable New York law establishes that

Irene Ursino, Claimant,
and
Countrywide Home Loans, Inc and
Countrywide Financial Corporation, Respondents

AAA Case No. 13-160-00299-05

Opinion and Partial Final Award

Claimant, as a manager and executive, is not an employee within the meaning of that law. The record is replete with indications from both parties that Claimant operated in an executive capacity, running the Branch with the authority and independence that mirrors the role of a CEO. Thus, she clearly falls within the category of individuals who are not covered by the law, as she "exercised the independent judgment of an executive," and is not covered by the cited statutory provisions. *Cantor Fitzgerald Associates LPO v. Mines*, 781 N.Y.S. 2d 622 (Sup. Ct. NY Co. 2003).

Claimant also argues that she is not bound by the Plan's restriction on eligibility because it creates a forfeiture of earned compensation, which is unenforceable under New York law. The case law cited on this point, however, underscores the distinction between the adjustable incentive compensation system at hand and payments that are more akin to sales commissions or even hourly billings which, on a policy basis, may not be forfeited once, unlike the current case, they have been earned by the employee. See *Weiner v. Diebold Group, Inc.*, 173 A. D. 2d 166 (N.Y. App. Div. 1991), in which the court found that the jury should resolve the fact question of whether incentive payments were to be regarded as discretionary bonuses or post-employment, earned commissions, and *Cohen v. Lord, Day & Lord*, 75 N.Y.2d 95 (N.Y. 1989), in which the court, citing public policy and the likely detriment to clients, denied enforcement of a provision that would have stripped an attorney, upon joining a competing firm, of income for services performed but for which the firm had not yet collected fees.

### 2.   Options

At the time her employment was terminated, Claimant held 1,181 vested options pursuant to the 2000 Equity Incentive Plan of Countrywide Financial Corporation (Amended and Restated Effective June 14, 2004) ("Option Plan"). Under the Paragraph 6.5(a) of the Option Plan, if an optionee's employment is terminated for "any reason other than death, Disability, Cause or Retirement . . . then the Optionee may at any time within three (3) months after his or her termination of employment exercise an Option to the extent, and only to the extent, the Option or portion thereof was exercisable at the date of such termination." Where termination is "for Cause, the Option shall terminate immediately and no rights thereunder may be exercised." "Cause" is defined in Paragraph 6.5 as follows:

> . . . (1) any act of (A) fraud or intentional misrepresentation or (B) embezzlement,
> misappropriation or conversion of assets or opportunities of the Company . . . or (2)
> willful violation of any law, rule or regulation in connection with the performance of an
> Optionee's duties (other than traffic violations or similar offenses), or (3) with respect to
> any office of the Company . . . commission of any act of moral turpitude or conviction of
> a felony.

Claimant argues that her termination was not "for Cause" as defined in the Option Plan and that she therefore was entitled upon termination to retain her options and to exercise them as provided in the Option Plan. The cancellation of the options, Claimant asserts, was a breach of the contractual obligations under the Option Plan for which she is entitled to recover damages equivalent to the value of those options. Claimant also argues that her unvested options should be restored, but this argument is

Irene Orsino  Claimant
and
Countrywide Home Loans, Inc. and
Countrywide Financial Corporation  Respondents

A.A.A Case No. 13 160 01780 05

Opinion and Partial Final Award

based upon the contention that her employment was terminated in violation of law or contract, and those arguments have not been accepted. Accordingly, the only issue to be resolved is whether Claimant was entitled to retain the 1,181 options that were vested at the time that her employment ended.

The parties are bound by the specific terms of the contract into which they entered, and the Options Plan specifies, in clear and unequivocal terms, the status of vested options upon an employee's termination of employment. If the termination was for cause, as defined by the Option Plan, Claimant's entitlement to those options ceased in accordance with Paragraph 6.5(a). Under the parallel provision of Paragraph 6.5(c), however, if the termination was for a reason other than cause, Claimant was contractually entitled to retain the options with the exercise rights as specified above.

"Cause" is narrowly defined under the Option Plan. Respondent asserts that Claimant was terminated for fraud or willful misrepresentation, both of which are within the definition of "cause." The record is clear, however, that Claimant was terminated because of operational deficiencies in the Branch and not because of any determination that she was involved in fraud. The Respondent argues that, by association, the fraud it asserts was committed by others should be imputed to Claimant, but the record does not support such a conclusion. The reasons stated to Claimant on the day of her termination have carried throughout the case and do not include an allegation of or evidence for fraud, to wit: disregard for Company policy, not properly managing the Branch, and conflict of interest. Accordingly, under the Option Plan, Claimant's termination was not for cause, and she was entitled to retain the 1,181 vested options. By cancelling those options, Respondent breached its contractual obligation to Claimant.

Pursuant to the agreement of the parties, the record was left open for the submission of evidence and arguments regarding the proper valuation of damages associated with the options. The Arbitrator encourages the parties to confer in an effort to develop an agreed measure of damages and to notify the AAA of same. Absent such an agreement, a conference call will be held on June 13, 2007, at 9:30 a.m. EDT, at which time the parties and Arbitrator will develop a plan for the submission of evidence and arguments regarding the determination of damages.

Irene Orsino, Claimant,
and
Countrywide Home Loans, Inc. and
Countrywide Financial Corporation, Respondents

AAA Case No. 13 160 00290 05

Opinion and Partial Final Award

---

## PARTIAL FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, have been designated pursuant to the parties' Mutual Agreement to Arbitrate Claims dated April 12, 2004, and in accordance with the American Arbitration Association's *National Rules for the Resolution of Employment Disputes Amended and Effective January 1, 2004.* Having been duly sworn, having heard the proofs, and having given full and fair consideration to all of the evidence submitted and all factual and legal arguments presented, I hereby issue the following PARTIAL FINAL AWARD:

1. The claims for age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§621-634, defamation, intentional infliction of emotional distress, unjust enrichment, *quantum meruit*, and breach of the covenant of good faith and fair dealing are denied.

2. The breach of contract claims related to incentive compensation under The Countrywide Financial Corporation, Consumer Markets Division Standard Branch Manager (BM) Incentive Compensation Plan, effective October 1, 2003, are denied.

3. Respondents breached the terms of the 2000 Equity Incentive Plan of Countrywide Financial Corporation (Amended and Restated Effective June 14, 2004) by cancelling Claimant's 1,181 vested stock options. The claim for breach of contract in this regard therefore is granted. By agreement of the parties, the record remains open for the submission of evidence and arguments regarding the determination of damages relating to this claim. The parties are encouraged to confer to determine if agreement may be reached on an appropriate sum. Absent such an agreement, a conference call will be held on June 13, 2007, at 9:30 a.m. EDT, at which time the parties and Arbitrator will develop a plan for the submission of evidence and arguments regarding the determination of damages.

4. All claims not expressly granted herein are denied.

This Partial Final Award is in full force and effect until such time as a Final Award is rendered.

Dated: 23 May 2007

Jacquelin F. Drucker, Esq.
Arbitrator

Page 14 of 15

Irene Orsino, Claimant,
and
Countrywide Home Loans, Inc. and
Countrywide Financial Corporation, Respondent;

AAA Case No. 13 160 00290 05

Opinion and Partial Final Award

## AFFIRMATION

STATE OF NEW YORK
                                    SS:

COUNTY OF NEW YORK

I, Jacquelin F. Drucker, an attorney admitted to practice in the State of New York, affirm pursuant to CPLR Section 2106 and under penalty of perjury that I am the Arbitrator in the foregoing matter and that this document, which I have executed on this date, is my Partial Final Award in this matter, issued in compliance with my oath and with all applicable laws, rules, and agreements.

Date  12 May 2007          Jacquelin F. Drucker, Esq
                                        Arbitrator

EXHIBIT "B"

# COUNTRYWIDE FINANCIAL CORPORATION
## Consumer Markets Division
### Standard Branch Manager (BM)
### Incentive Compensation Plan

**Effective October 1, 2003**

**A. MONTHLY INTERNAL PRODUCTION INCENTIVE**
1. The Monthly Internal Production Incentive is the sum of the incentives by finance type, net of adjustments for the incentive period.
2. Internal Production includes both personal production and Internal Home Loan Consultant primary originator fundings. It excludes EHLC, EHLC Sales Manager (SM) production and HFN sourced loans.
3. The monthly incentive is paid at the end of the month following the incentive period.

**Internal Purchase/Refinance Incentive Table (Retro)**

| Units | Volumes | | Factor |
|-------|---------|---|--------|
| 1-5 | $1 | - $449,999 | .20% |
| 6-7 | $450,000 | - $599,999 | .25% |
| 8-10 | $600,000 | - $1,099,999 | .30% |
| 11-15 | $1,100,000 | - $1,599,999 | .35% |
| 16+ | $1,600,000 + | | .40% |

4. **Internal Purchase Units and Refinances (Port, Non-Port and Port Plus)** are paid per the table above.

**Monthly HELOC/Seconds (Stand Alone & Piggyback) Incentive Liability the greater of the flat amount (Retro)**

| Units | Draw | Line * | Flat $ |
|-------|------|--------|--------|
| 1-8 | .30% | .10% | $35 |
| 9-15 | .35% | .10% | $35 |
| 16+ | .40% | .10% | $35 |

\* The maximum paid per the line amount is $200.

5. **Monthly HELOCs/Seconds (Stand Alone and Piggyback) Units** are paid per the table above. A BM is paid the greater of basis points on the initial draw amount, .10% on the line amount, or a flat dollar amount of $35 per loan.

**B. MONTHLY INCENTIVE ADJUSTMENTS**
1. Funded Full Spectrum Lending transfers contribute to incentive per the tables above.
2. A Tax Advantage Mortgage Insurance (TAMI) sale contributes the greater of .05% or $50 per loan, but no Unit value per the tables above.
3. "One Time Close Prime +" loans are paid an additional .125% to the tables above.
4. Consumer affinity "pull-through awards" and other revenue sharing arrangements will result in a negative adjustment of half the cost incurred.
5. Uncollected third party fees on funded and non-funded loans will result in a negative adjustment of 100%.
6. Unfunded loans impact the incentive in the period in which the loan unfunds.

**Monthly Incentive Example:**
*Internal Purchase/Refinance Calculation*

| Units | Finance Type | Factor | Volume $ | | Incentive | |
|-------|-------------|--------|----------|---|-----------|---|
| 1 | Portfolio Plus | 0.35% | $ | 110,000 | $ | 385.00 |
| 2 | Portfolio Plus | 0.35% | $ | 110,000 | $ | 385.00 |
| 3 | Non-Portfolio | 0.35% | $ | 120,000 | $ | 420.00 |
| 4 | Non-Portfolio | 0.35% | $ | 141,100 | $ | 493.85 |
| 5 | Non-Portfolio | 0.35% | $ | 92,000 | $ | 322.00 |
| 6 | Purchase | 0.35% | $ | 140,000 | $ | 490.00 |
| 7 | Purchase | 0.35% | $ | 150,000 | $ | 525.00 |
| 8 | Purchase | 0.35% | $ | 136,000 | $ | 476.00 |
| 9 | Portfolio Refinance | 0.35% | $ | 138,000 | $ | 483.00 |
| 10 | Portfolio Refinance | 0.35% | $ | 110,000 | $ | 385.00 |
| 11 | Portfolio Refinance | 0.35% | $ | 127,000 | $ | 444.50 |
| **Total Internal Purchase/Refinance Incentive** | | | **$** | **1,374,100** | **$** | **4,809.35** |

*The information contained herein is confidential and proprietary business information and may not be distributed to persons or entities out the express permission of Countrywide Senior Management.*

CHL 00195

CONFIDENTIAL

Consumer Markets Division
Branch Manager Incentive Plan

**TAMI Calculation**

| Finance Type | Volume $ | | Factor | | BPS Payout | Flat $ | | Incentive* |
|---|---|---|---|---|---|---|---|---|
| TAMI | $ 141,100 | x | 0.05% | = $ | 70.55 | $50 | $ | 70.55 |
| TAMI | $ 92,000 | x | 0.05% | = $ | 46.00 | $50 | $ | 50.00 |
| Total TAMI Incentive | | | | | | | $ | 120.55 |

*Incentive will be the > of 5 BPS or $50 per loan

**HELOCs/Seconds (Stand Alone and Piggyback) Calculation**

| Units | Finance Type | Initial Draw | Draw Factor | Draw Payout | | Line | Line Factor | Line Payout | | Flat $ | | Incentive* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Piggy | $ 25,000.00 | 0.30% | $ | 75.00 | $ 25,000.00 | 0.10% | $ | 25.00 | $ 35.00 | $ | 75.00 |
| 2 | Piggy | $ 7,000.00 | 0.30% | $ | 21.00 | $ 10,000.00 | 0.10% | $ | 10.00 | $ 35.00 | $ | 35.00 |
| 3 | SA Heloc | $ 7,500.00 | 0.30% | $ | 22.50 | $ 30,000.00 | 0.10% | $ | 30.00 | $ 35.00 | $ | 35.00 |
| 4 | SA Heloc | $ - | 0.30% | $ | - | $ 50,000.00 | 0.10% | $ | 50.00 | $ 35.00 | $ | 50.00 |
| 5 | SA Heloc | $ 35,000.00 | 0.30% | $ | 105.00 | $ 45,000.00 | 0.10% | $ | 45.00 | $ 35.00 | $ | 105.00 |
| Total SA and Piggy HELOCS Incentive | | | | | | | | | | | $ | 300.00 |

*Incentive will be the > of the Draw, Line, or Flat $

| **Finance Types:** | | Incentive |
|---|---|---|
| Internal Purchase/Refi Units | $ | 4,809.35 |
| Tax Advantage Mortgage Insurance (TAMI) | $ | 120.55 |
| HELOCs/Seconds (Stand Alone & Piggyback) Units | $ | 300.00 |
| Total Incentive before Incentive Adjustments: | $ | 5,229.90 |
| **Incentive Adjustments:** | | |
| Consumer Affinity Pull Through Awards | $ | (500.00) |
| Uncollected Third Party Fees | $ | (500.00) |
| **Total Net Incentive Payable:** | $ | 4,229.90 |

### C. QUARTERLY PROFIT INCENTIVE

1. Qualifier: To earn the Quarterly Profit Incentive, the Branch must generate 36 units in Branch Originated Purchase fundings or $6M volume in Branch Originated Purchase fundings (including Purchase Piggyback HELOC Draw Volume) for the quarter.
2. The Quarterly Profit Incentive is calculated based on Branch Originated Profit, which includes corporate expense allocations.
3. Prior to calculating the Quarterly Profit Incentive, any EHLC SM override and BM profit incentive is added to the Branch Originated Profit.
4. The Quarterly Profit incentive is subject to modifiers per Section D.
5. EHLC SM overrides, salaries and other non-sales related compensation are deducted from the Quarterly Profit Incentive after modifiers are applied.
6. The Quarterly Profit Incentive is paid 45 days following the production period.
7. The HFN Profit is paid at a flat rate of 5% and does not count toward the Branch Originated Profitability Incentive table.

### D. MODIFIERS

1. Modifiers are applied to the quarterly profitability incentive.
2. Modifiers consist of a minimum of **three** Mandatory modifiers (see #3) determined by CMD Admin and a maximum of **four** optional Manager Selected modifiers from a predefined pick list.
3. The three mandatory modifiers are Deficiencies, Late File Performance and Regulatory (Level 3) Compliance.
4. Performance targets will be established at the beginning of the quarter.
5. Modifiers can have an overall neutral impact, increase the profitability incentive up to +25%, or eliminate the profitability incentive entirely.
6. Employees hired after the 20th of the 1st month in quarter, the modifier impact is neutral.
7. Complete details on Modifiers will be provided via a separate document.

| Branch Originated Profitability Incentive Table (Non Retro) | |
|---|---|
| Profit | Factor |
| $1.00        - $49,999.99 | 3.50% |
| $50,000.00  - $99,999.99 | 6.50% |
| $100,000.00 - $149,999.99 | 9.50% |
| $150,000.00+ | 12.75% |

*The information contained herein is confidential and proprietary business information and may not be distributed to persons or entities or the express permission of Countrywide Senior Management.*

CHL 00196

CONFIDENTIAL

**Quarterly Branch Originated Profit Incentive Example:**

| | | | |
|---|---|---|---|
| Branch Originated Quarterly Profit | $ | 180,310.30 | |
| Branch Manager Profit Incentive/Accrual | $ | 12,689.70 | |
| EHLC SM Override | $ | 2,000.00 | |
| Adusted Branch Originated Quarterly Profit | $ | 195,000.00 | |
| Adusted Branch Originated Quarterly Profit Incentive | | | $ 15,487.47 |
| (49,999.99 *3.5%) + (49,999.99 * 6.5%) + (49,999.99 * 9.5%) + (45,000.03 * 12.75%) | | | |
| 1,749.99  +  3,249.99  +  4,749.99  +  5,737.50 | | | |
| | | | |
| **Quarterly Home Finance Network Incentive** | | | |
| HFN Profit | $ | 30,000.00 | |
| HFN Profit Incentive  ( 30,000 * 5%) | | | $ 1,500.00 |
| Total Quarterly Profit Incentive Before Modifier | | | $ 16,987.47 |
| | | | |
| **Adjustments** | | | |
| Mandatory Modifier Impact of 5% ($16,987.47 X 5%) | | | $ 849.37 |
| Total Quarterly Incentive After Mandatory Modifier | | | $ 17,836.84 |
| Manager Selected Modifier Impact 0% | | | $ - |
| EHLC SM Override | | | $ (2,000.00) |
| **Net Quarterly Profit Incentive Payable:** | | | $ 15,836.84 |

**E. DEFINITIONS\*\***

1. "Purchase Unit" is a First Trust Deed Loan funded by Countrywide's Consumer Markets Division or designated affiliate within the incentive period in conjunction with a purchase transaction.
2. "Portfolio Refinance Unit" is a First Trust Deed Loan funded by Countrywide's Consumer Markets Division or designated affiliate within the incentive period in conjunction with a refinance for a borrower and loan currently in Countrywide's servicing portfolio, excluding Portfolio Plus Refinance Units.
3. "Portfolio Plus Refinance Unit" (Port Plus) is a First Trust Deed Loan funded by Countrywide's Consumer Markets Division or designated affiliate within the incentive period in conjunction with a refinance for a borrower and loan on which the original loan was funded after 1/1/02 and is being refinanced by the same Countrywide Originator.
4. "Non-Portfolio Refinance Unit" is a First Trust Deed Loan funded by Countrywide's Consumer Markets Division or designated affiliate within the incentive period in conjunction with a refinance of a loan not currently in Countrywide's servicing portfolio.
5. HELOC/Second Unit (Stand Alone or Piggyback) is a Home Equity Line of Credit or Second Trust Deed funded by Countrywide's Consumer Markets Division or designated affiliate within the incentive period.
6. "Flex Saver Loans" are considered first lien mortgages (Purchase or Refi) not HELOCs/Seconds.

   \*\* Countrywide reserves the right to designate the characterization of each loan in its sole and absolute discretion

**F. ADMINISTRATION**

1. Loans not properly sourced will not be eligible for incentive. Countrywide reserves the right to withhold and not pay any incentives for any loan obtained or funded by fraud, other misdeed, or material contradiction to the Pricing Policy.
2. Countrywide reserves the right to make a negative adjustment to any incentive based on any loans that were funded in contradiction to policy guidelines if the employee previously received a incentive payment for such loans.
3. Violations of Countrywide loan guidelines and policies may result in suspension from this Incentive Plan and disciplinary action up to and including termination.
4. The Plan Administrators reserve the right to change the incentive schedules, modifiers and/or factors at any time.

*The information contained herein is confidential and proprietary business information and may not be distributed to persons or entities outside of Countrywide without the express permission of Countrywide Senior Management.*

CHL 00197

**Incentive Plan Acknowledgement**

As a condition of participation in this Incentive Plan, you agree that during the course of employment and for twelve (12) months thereafter you will not directly or indirectly solicit, recruit, attempt to employ or induce any Countrywide employee to work for you or for any business, person or entity.  Notwithstanding the foregoing, in the event you are entitled to a severance benefit under the Countrywide Financial Corporation Change in Control Severance Plan as amended, you will no longer be bound by this non-solicitation provision.

I acknowledge that without my signature to demonstrate the acceptance of this Incentive Plan, I will be ineligible for any incentive payment provided for in this Incentive Plan.

I understand and agree to the use of an electronic method of signature to demonstrate my acceptance of the terms and conditions of this Incentive Plan, and any applicable amendment including the Countrywide Financial Corporation Incentive Plan Terms and Conditions, and all related business practices and policies, all of which are incorporated into and made a part of this Incentive Compensation Plan and may be revised from time to time.

*The information contained herein is confidential and proprietary business information and may not be distributed to persons or entities the express permission of Countrywide Senior Management.*

CHL 00198

CONFIDENTIAL

EXHIBIT "C"

## COUNTRYWIDE FINANCIAL CORPORATION
## INCENTIVE PLAN
## TERMS AND CONDITIONS
### Effective: May 1, 2003

1. Purpose

The purpose of the Countrywide Financial Corporation Incentive Plan(s) is to attract and retain individuals as employees of Countrywide Financial Corporation and to provide incentive compensation that is based on their performance and contribution to the Company.

2. Definitions

(a)    "Company" means Countrywide Financial Corporation and any entity that comprises Countrywide Financial Corporation

(b)    "Eligible Employee" means an employee of the Company who has been designated by the Plan Administrator as eligible to participate in an Incentive Plan and has agreed to the Incentive Plan and these Terms and Conditions. An employee who has not satisfied each of these requirements is not an Eligible Employee and cannot participate in a Company Incentive Plan.

(c)    "Eligibility Date" means, for the following Incentive Periods, the business day on or before the 20th day of the month for the Monthly; the last day of the second month for the Quarterly; the last day of the fourth month for the Semiannual; and the last day of the ninth month for the Annual

(d)    "Incentive" means the amount calculated pursuant to the Incentive Plan and subject to these Terms and Conditions.

(e)    "Incentive Payment Period" means each of the periods described in Section 4 hereof.

(f)    "Incentive Period" means the period of time used to calculate the Monthly, Quarterly, Semiannual or Annual Incentives.

(g)    "Incentive Plan" means the incentive plan assigned to an Eligible Employee which determines the amount of Incentive that will be calculated for an Eligible Employee. The term "Incentive Plan" may include the incentive specified in an Offer Letter until such time as an Incentive Plan is assigned to the Eligible Employee.

(h)    "Leave of Absence" means an authorized leave of absence taken in accordance with the Company's policies.

CHL 00806

(i)      "Offer Letter" means the written, formal, offer of employment made by the Company to, and agreed by, the Eligible Employee.

(j)      "Personal Performance Incentive" means an Incentive based on fundings or other units of measurement contained in the Incentive Plan attributable to the Eligible Employee and not based on or related to the results of a team or others.

(k)      "Plan" means the Countrywide Financial Corporation Incentive Plan Terms and Conditions and all Incentive Plans that it governs.

(l)      "Plan Administrator" means the Company's Compensation Department or such persons designated by a Divisional Managing Director.

(m)      "Prorated Incentive" shall mean, at the Plan Administrator's discretion, an Incentive determined by (i) using a ratio of days worked by the Eligible Employee to total business days of the Incentive Period; or (ii) with respect to a Personal Performance Incentive, fundings or such other units of measurement contained in the Incentive Plan for which the Eligible Employee was responsible.

(n)      "Terms and Conditions" means this Countrywide Financial Corporation Incentive Plan Terms and Conditions.

3. Eligibility for Incentive

(a)      Unless otherwise provided herein or in the Incentive Plan, in order to be eligible for an Incentive an Eligible Employee:

(i)  must be employed in active status from the first business day of the Incentive Period through the last day of the following month except in the case of the Annual Incentive which requires the Eligible Employee to be in active status through the 75th day following the Annual Incentive Period;

(ii)  an Eligible Employee who commences employment after the beginning of an Incentive Period, must be employed in active status on or before the Eligibility Date through the last day of the following month.

(b)      An Eligible Employee who commences employment after the Eligibility Date shall not be eligible for an Incentive until the next Incentive Period.

4. Incentive Payment Periods

Unless otherwise provided in the Incentive Plan, payment of the Incentive shall occur as follows:

CHL 00807

(a) Monthly Incentive. The Monthly Incentive is based on the calendar month and the payment of the Monthly Incentive occurs on the last business day of the month following the month for which the Incentive is calculated.

(b) Quarterly Incentive. The Quarterly Incentive is based on the calendar quarter. Payment of the Quarterly Incentive occurs on the last business day of the month following the end of the quarter for which the Incentive is calculated.

(c) Semiannual Incentive. The Semiannual Incentive is based on a calendar six-month period. Payment of the Semiannual Incentive occurs on the last business day of the month following the end of the six-month period for which the Incentive is calculated.

(d) Annual Incentive. The Annual Incentive is based on the calendar year. Payment of the Annual Incentive occurs on or before the 75th day following the end of the calendar year or such other twelve-month period.

5. Adjustments

Any overpayments of Incentives will be accumulated, and a negative adjustment will be made to subsequent Incentives payable to the Eligible Employee. In the event an Eligible Employee's employment with the Company terminates for any reason, if there is any incentive to be paid, the Eligible Employee's Incentive will be subject to a negative adjustment for any prior Incentive overpayments. Further, upon the Eligible Employee's termination from employment for any reason, the Eligible Employee hereby acknowledges and authorizes that any negative adjustments may also be deducted from the Eligible Employee's final paycheck.

6. Proration of Incentive

(a)     New Employees. An Eligible Employee who commences participation in an Incentive Plan after the Incentive Period commences but on or before the Eligibility Date shall be eligible for the Prorated Incentive.

(b)     Leaves of Absence. An Eligible Employee who is on a Leave of Absence will be eligible for the Prorated Incentive, paid pursuant to Section 4 hereof. Personal Performance Incentives achieved during a Leave of Absence will be calculated and paid after return from the Leave of Absence. Other Incentives will not be calculated or paid for the period of time an Eligible Employee is on a leave of absence.

(c)     Termination of Employment. An Eligible Employee whose employment is terminated because of a lay-off, reduction in force or death shall be eligible for the Prorated Incentive paid pursuant to Section 4 hereof. An Eligible Employee who voluntarily resigns or whose employment is involuntarily terminated (other than by lay-off, reduction in force or death), at any time, prior to the date on which a Monthly, Quarterly, Semiannual or Annual Incentive is paid, will not be eligible to receive an

CHL 00808

Incentive unless otherwise stated in the Incentive Plan or as required by applicable state law.

(d) Transfer of Eligible Employee. In the event an Eligible Employee transfers to another position, causing him or her to participate in a different Incentive Plan, the Eligible Employee will be eligible to receive the Prorated Incentive from both Incentive Plans without regard to the Eligibility Date and paid pursuant to Section 4 hereof

7. <u>General Provisions</u>

(a) This Plan may be amended or terminated by the Plan Administrator at any time; provided, however, that no such amendment or termination shall impair an Incentive that has already been calculated.

(b) Nothing contained in this Plan shall confer upon any Eligible Employee any rights or benefits, except as provided in this Plan. This Plan does not constitute a contract for continued employment with the Company. Employment with the Company is at the mutual consent of the employee and the Company, and either may terminate the employment relationship at will, at any time, with or without cause or advance notice. Any Incentive paid does not give rise to any contractual obligation to provide any Incentive in the future.

(c) These Terms and Conditions govern the administration of Incentive Plans throughout the Company. In the event of a conflict between the Terms and Conditions and an Incentive Plan, the Incentive Plan will govern.

(d) The Plan Administrator is responsible for, and has sole authority to, interpret these Terms and Conditions and any Incentive Plan. Any and all disputes relative to an Incentive shall be decided by the Plan Administrator. The decision of the Plan Administrator is final and binding.

**I hereby acknowledge that I have read, fully understand and agree to be bound by all of these Terms and Conditions and the Incentive Plan. I understand and agree to the use of an electronic method of signature to demonstrate my acceptance of these Terms and Conditions as stated herein and in the Incentive Plan.**

CHL 00809